BELRIDGE OIL COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 31218. Promulgated August 16, 1932.

*John B. Milliken, Esq.,* for the petitioner.
*R. W. Wilson, Esq.,* for the respondent.

OPINION.

MORRIS: While the respondent's deficiency notice covers deficiencies for the years 1921 to 1923, inclusive, and while the petition states that the taxes " in controversy are income and profits taxes for the years 1921 to 1923, inclusive," the said petition, as amended, fails to allege error on the part of the respondent in other than the year 1921, and, since the evidence adduced at the hearing was confined to the issues pertaining exclusively to the year 1921, the respondent's motion, made at the hearing, to affirm his determination of the deficiencies for 1922 and 1923 is granted.

Our sole question for determination is the " actual cash value " of the option " at the time of " its payment for the capital stock of the petitioner on January 25, 1911. (Sec. 326, Revenue Act of 1921.) It is conceded by counsel for the respondent that, if the value of the option is satisfactorily substantiated, there is no question about its inclusion in invested capital to the extent justified by the proof.

The identical question here, affecting this same option, was presented to this Board for consideration in *Belridge Oil Co.*, 11 B. T. A. 127, involving the years just preceding 1921, and we there sustained the respondent in his determination " that the option was worth on January 25, 1911, only what was paid for it on January 5 of the same year," i. e., $25,000. We concur in the views urged by the petitioner that the decision there, based upon the facts adduced at that time, which facts are not before us here, is not *res adjudicata* (*Union Metal Mfg. Co.*, 4 B. T. A. 287), but, since the same property, the same issues, and the same principles with respect thereto are involved here, a brief review of that case may prove helpful.

Premising its consideration of the question there presented by directing attention to the terms of the option itself and to the fact that it was the result of negotiations between parties dealing at arm's length, that they were dealing with prospective oil lands, that by their agreement they provided for their exploration, and that they fixed $25,000 as the actual cash cost of the option, the Board said:

In our opinion, under the circumstances of this case, this agreement is entitled to great weight. It was executed in the light of such knowledge as the parties possessed about the character and value of the land. It does not appear that the parties were unadvised of any of the elements of its value, nor does it appear that any new proof of value was discovered between the giving of the option and its assignment to petitioner. The fact that one Van Slyke sometime in 1910 discovered an outcrop of oil sand on the property is not shown to be controlling. This discovery preceded the giving of the option to Hole and for aught that appears the existence of this outcrop may have been known to Hole when he acquired the option. The evidence does not indicate that at the time of the assignment petitioner had any greater knowledge of the oil-bearing properties of

the land than had Hole when he took the option. When petitioner acquired the option the land was still unproven. No wells had been completed nor had the presence of oil in commercially profitable quantities been otherwise proven.

With the exception of the statement there made indicating the probability that Hole may have had knowledge of the existence of the outcroppings on this tract of land when he acquired the option, the same controlling principles discussed there obtain with equal force here.

While it appears that Hole was acting for the interests of all concerned, it can not be overlooked that he actually consummated the option with Mrs. Hopkins, and that he was in possession of no more nor less favorable information than Mrs. Hopkins, and therefore, it must be concluded that the transaction here, as found in the former decision, was at arm's length and that the cash consideration therefor was arrived at based upon all of the factors then known to them. There was, so far as we are informed, no deception practiced between the parties who consummated the deal. Granting that Hole and Mrs. Hopkins were totally ignorant of the information in the possession of Green, Whittier and Van Slyke (although the record does not show and we have no way of knowing that Mrs. Hopkins was not in possession of such facts, or facts equally as valuable), Hole knew, and so did Mrs. Hopkins know, the strategic location of, and the fact that the land contained prospective oil, and that was all that anyone knew with any degree of certainty. She could also reasonably infer that these men had informed themselves about the matter, and she may reasonably have suspected, and no doubt did, that they possessed valuable information about the land. Otherwise, they would not have been so willing and anxious, in fact, to venture $25,000 in the satisfaction of a mere empty curiosity. And it is not as though she, being an untrained woman in such matters, had been misled, because the entire transaction, as the record discloses, was supervised and consummated by her personal counsel and representatives, who must be presumed to have taken proper precautions to protect her interests.

Let us review the evidence in support of the value contended for by the petitioner.

The record shows that the Associated Oil Company acquired acreage in Kern County, California, in 1910, at a cost to it of $66⅔ per acre. The petitioner contends that that property was not as favorably located as the property in question. In fact, one of its witnesses so testified and attempted to give his reasons therefor, which are far from convincing. The witness testified that for the reason stated that property was less valuable than the petitioner's tract. While we are reasonably convinced that the properties were similar

in many respects, being in the same general locality, we are not convinced that they were less favorably located in respect to production than the petitioner's properties. As we read the map before us, two of the tracts, there being five in all, were almost if not adjacent to the Lost Hills properties and within what appears to us to be a very short distance of producing wells. The other three tracts, as we locate them on the map, are as near, if not nearer, to the Lost Hills territory, then a producing field, than the petitioner's tract. But our principal difficulty with this evidence lies in the fact that we do not know from the record what the state of development was with respect to this tract of land, whether or not oil had been discovered thereon at the time of its purchase at $66⅔ an acre, or whether it was virgin soil, and, therefore, comparable to the petitioner's tract. The evidence is very unsatisfactory respecting this purchase and consequently we are able to give it but very little weight in determining the " actual cash value " of the *option* in question.

Nor do we attach serious importance to the testimony of Green and Connell respecting his and Whittier's purported offer of $500,000 for one-fifth of the capital stock of the petitioner which Connell owned, for the reason, among others, that as we view the testimony the transaction had not sufficiently crystallized to be regarded as more than a trifling indication of value. Connell testified that he inquired of the members of the board of directors as to the methods to be employed in the development of the properties—if they were to be extravagant—and he stated that if they were to be he might be compelled to sell his interest. Whereupon Whittier inquired what he would take therefor, but Connell made no reply. It was then that the purported offer was made, to which Connell testified " I changed the conversation and discussed the question of sale no further."

We have the testimony of Green, who qualified as an expert through his long and intimate association with the oil business; and Harry R. Johnson, who qualified as an expert through his educational training in geology and his long experience in geological survey work, and, particularly his knowledge in the general region in question; and W. W. Orcutt, who also qualified as an expert through his educational training in geology and his later experience in the oil business.

Green testified that, in his opinion, the "actual cash " or " fair market value " of the land on January 25, 1911, was $100 an acre, based upon sales in the Lost Hills territory—with which the record shows he had no familiarity other than pure hearsay—and upon what he considered that other companies would have been willing

to pay for the land had they possessed the information which he and his associates did.

Johnson, who visited the properties in question about two weeks before the hearing, apparently for the purpose of qualifying himself as a witness with respect thereto, was asked:

Now, as a competent geologist, as a person who advised people in 1910, and in the second place taking into account and assuming the location of the structures reported by Mr. Van Slyke, and what in your opinion would a person have been authorized to pay, a person who is a willing purchaser and not compelled to purchase, to a willing seller, not compelled to sell, on January 25, 1911, a person being in possession of the information in possession of which Mr. Green and Mr. Whittier and Mr. Van Slyke were—

and he replied:

"Very close to three million dollars—two million nine hundred and some odd thousand." He said that his opinion as to the value of the land was based upon his scientific education as a geologist, and years of experience plus several years in this region, which, at that time "was very active in the transfer of properties." He did not, however, attempt to enlarge upon his knowledge of such transfers of property about which he spoke.

Orcutt, who visited the property about a week before the hearing, merely corroborated the general testimony of Johnson and testified, in reply to a hypothetical question somewhat similar to that put to Johnson, that in his opinion the fair market value of the land in 1911 was $2,700,000, based, as he said, upon the similarity of the outcroppings and structure of this property to that of Lost Hills and other fields and upon his scientific education in geology and his experience in the profession.

None of these witnesses testified to the actual cash value of the option itself, nor did they testify to any cases where similar options had been sold. In fact they demonstrated no knowledge on the subject of options.

The petitioner proposes that we accept the value of $2,700,000 placed upon the land by Orcutt, and it contends that the "actual cash value" of the option on January 25, 1911, when it was transferred to it, was the difference between that figure and the purchase price, $1,028,198.67, to be paid for the land in the event of the exercise of the option, or an actual cash value of the option itself of $1,671,801.33.

Assuming generally the correctness of the theory urged by the petitioner, we are confronted with this situation: An "actual cash" payment for the option in January, 1911, of $25,000, which the petitioner would have us supplant by a purely theoretical value, measured by the value of the land, based upon opinion testimony supplied

about twenty years after consummation of the transaction. Of course there are occasions where no actual cash is involved in the transaction, necessitating a substitute for tax purposes, but that is not the case here. It seems to us that if the theory urged by the petitioner, that is, of assigning a value to the option equal to the difference between the theoretical value of the land and the proposed purchase price thereof as set forth in the option, has any place in such determinations of value at all, it should and necessarily must be confined to those cases in which no, or only a very nominal, consideration was given for the option and not where, as here, a very substantial price was paid, to wit $25,000, and which appears to be the real cash value thereof at the time of the transaction.

Naturally when property is purchased at a stated time for $25,000 and it is contended, twenty years later, that that same property would have sold for the huge sum of $1,671,801.33 cash at that time, the human mind becomes skeptical and requires considerably more than ordinary proof. Now all that we have, of any tangible importance, is opinion evidence of one man who was a party to the transaction and the testimony of two experts who visited the property just a few days before the hearing in order that they might visualize and confirm, if possible, conditions as they were supposed to exist thereon in 1911. It is because of the extremely flexible nature of opinion testimony that such should be carefully weighed. These witnesses testify unqualifiedly to the respective values which we have referred to before and they did so primarily, if not entirely, from their geological observations. Witness Johnson testified that in this region all geology was on the surface. As we understand this, it may be reasonably inferred that any geologist might visit this particular piece of property and determine from surface formations that the property contained oil. If the matter was so obvious to the trained expert, we are unable to understand why others who had already explored this field were unable to discover the presence of oil, for, as Green himself testified, other companies had scouts over the property, but had never discovered any indications of oil.

There is still another important factor which influences our conclusion, and that is that Mrs. Hopkins had agreed to sell the entire tract of land, after the discovery of oil thereon, for $1,028,-198.67, which figure was fixed with the most optimistic outlook that could possibly attend the development of the land and, consequently, represents what the parties regarded the fair market value of the tract of land to be as a producing oil field. Therefore, we can not minimize this factor when the parties urge us to

place a value on the option itself, in 1911, prior to the actual discovery of oil, of $1,671,801.33, or nearly $700,000 more for the option than the vendor was perfectly willing to sell the land for as, if and when it should become a producing oil field.

Then, too, the testimony of these experts is retrospective in its nature, a factor which must be considered in weighing the evidence. A somewhat analogous situation was presented in *Tracy et al.*, 15 B. T. A. 1107, where the petitioner introduced various real-estate men to testify to the March 1, 1913, value of certain realty. With respect to their testimony the Board premised its considerations by saying: " None of these witnesses had actually made an appraisal of the Manhattan property in 1913, but were expressing their opinion at the present time of what the value of the property was in 1913," which is true here, and, continued the Board: " This testimony, then, is retrospective in its nature and is subject to the weaknesses of that type of appraisal." Upon rejection by the Board of the values testified to there the matter was reviewed by the Circuit Court of Appeals in *Tracy* v. *Commissioner*, 53 Fed. (2d) 575. It was there contended that, the only evidence of value introduced before the Board being opinion evidence of experts, the Board was under obligation to accept the petitioner's valuation, and the court said:

* * * While the opinions of experts are competent and often very helpful, such evidence is not considered binding upon the tribunal before which it is produced, at least not to the extent that such tribunal is bound to follow it if contrary to the best judgment of its members. *Anchor Co.* v. *Commissioner*, 42 F. (2d) 99 (C. C. A. 4) ; *Am-Plus Storage Battery Co.* v. *Commissioner*, 35 F. (2d) 167 (C. C. A. 7). But it is true that no administrative board may act arbitrarily and without evidence, and this suggests other questions which here arise, viz., whether there was substantial evidence before the Board to support its findings and, if so, the effect to be given to this fact.

See also *Uncasville Mfg. Co.* v. *Commissioner*, 55 Fed. (2d) 893.

In reaching the conclusion which we deem inescapable, we do not do so arbitrarily, nor have we substituted our own " knowledge, experience and judgment " for the opinions of these experts. There are two bases of valuation of record—not merely the one which the petitioner would have us accept—and after carefully weighing all considerations pertaining to each of them the result is that we are forced to reject the valuations tendered by these experts and to adopt the other. In other words, we are not convinced from the evidence that the theoretical " actual cash value " should be substituted for the value as measured by " actual cash." Cf. *Van Kannel Revolving Door Co.*, 11 B. T. A. 1209; affd., 36 Fed. (2d) 1022; and *Keystone Wood Products Co.*, 19 B. T. A. 1116.

Reviewed by the Board.

*Judgment will be entered for the respondent.*

McMAHON, dissenting: I do not agree with the majority opinion in holding that the option for the sale of the Hopkins land (sometimes referred to as the Belridge property in the record) in fee simple, under the favorable conditions to the purchaser giving him at least one year in which to exercise the option at so favorable a price as $33⅓ per acre, had an actual cash value of only $25,000 at the time such option was paid in to petitioner for stock.

Since I presided at the hearing in this proceeding and had an opportunity to see the witnesses upon the witness stand, all of whom were called by the petitioner, and observe the candor, earnestness, sincerity and intelligence with which they testified, I feel that I would be derelict in my duty if I did not make known my views fully.

The valuation of $25,000 placed upon the option in the majority opinion is based primarily upon the fact that such option, which was entered into on January 5, 1911, provides for the payment by Hole of $25,000 and that this was the amount furnished by Green and paid by Hole for it. An essential question for determination here is whether that transaction establishes the actual cash value of the option, notwithstanding the infirmities of the transaction and the rather voluminous evidence in the record to the contrary.

The proceedings of the Board and its Divisions are conducted in accordance with the rules of evidence applicable in courts of equity of the District of Columbia. (Sec. 907(a) of the Revenue Act of 1924, as amended by sec. 601 of the Revenue Act of 1928.) It has been held by the courts of the District of Columbia that evidence of a " fair sale " of the same property, when not too remote from the date of valuation (the element of remoteness is not in question here), may outweigh expert opinion evidence, *standing alone*, upon the subject of value; and no presumption or prima facie showing of the correctness of the value fixed by the sale arises unless the sale is a " judicial " or " fair public " sale. *Andrews* v. *Commissioner*, 38 Fed. (2d) 55; affirming *Estate of Effie Andrews*, 13 B. T. A. 651; *Hazelton* v. *Le Duc*, 10 App. D. C. 379; and *Ruppert* v. *McArdle*, 42 App. D. C. 392. Since there was no " judicial " or " fair public " sale effected in the instant proceeding, no such presumption arises and no such prima facie showing has been made. On the other hand, the sale of the option, relied upon by the majority opinion (as appears therefrom) as a basis for valuation in this proceeding, was not a " fair sale," as will be pointed out presently, and hence it can not be permitted, under any rule established by these cases, to outweigh expert opinion evidence upon the subject of value, *standing alone*, or otherwise. Furthermore, the expert opinion evidence upon the subject of value in the instant proceeding *does not stand alone*. On

the contrary, it is well corroborated and fortified by other undisputed facts and circumstances, many of which are inherent in the situation, as will likewise be pointed out.

In passing it may be said that no authority has been found to support the view that the value fixed in any sale made at or near the date of valuation is conclusive of the value of the property in question at such date as against all evidence or as against expert opinion evidence, standing alone, or that it is the best evidence in the sense that no other evidence will be used as a basis for determining such value. This view, if enforced in any case, might give rise to the question as to whether it would be in violation of the Fifth Amendment to the Federal Constitution in so far as it guarantees due process of law. Cf. *Heiner* v. *Donnan*, 285 U. S. 312; *Schlessinger* v. *Wisconsin*, 270 U. S. 230; *United States* v. *Lee*, 106 U. S. 196; and *Zeigler* v. *South & North Ala. R. R. Co.*, 58 Ala. 594.

With regard to the establishing of fair market value, the following appears in *Andrew B. C. Dohrmann*, 19 B. T. A. 507:

We think it is well settled that whether property at a given date has a fair market value or not is a question of fact to be determined from all of the evidence introduced and admitted in each individual case; that no set rule or formula can be employed; and that in weighing and sifting the evidence the fact to be found, if it exists, is the cash price at which a seller willing but not compelled to sell and a buyer willing but not compelled to buy, *both having reasonable knowledge of all the material circumstances, will trade*. *Walter* v. *Duffy*, 287 Fed. 41; *Phillips* v. *United States*, 12 Fed. (2d) 598; *Heiner* v. *Crosby*, 24 Fed. (2d) 191; *O'Meara* v. *Commissioner, supra; Ault & Wilborg Co., supra;* and *James Couzens*, 11 B. T. A. 1040. [Italics supplied.]

This applies with equal, if not greater, force to the instant proceeding, which involves the determination of actual cash value.

Looking to substance and not mere form, it appears that Hole, in negotiating for the second option, was in reality acting in behalf of the group composed of himself, Green, Whittier, Connell and Buck. Green furnished the $25,000 for Hole to pay for the option. Thus in the negotiations for the option the real parties were the group, on the one hand, and Mrs. Hopkins, on the other. Green and Whittier, the two moving spirits, had actual knowledge of the presence of oil sands on the land, whereas the inference to be drawn from the evidence is that Mrs. Hopkins did not have such knowledge. The evidence shows that Green and Whittier were very careful to keep their knowledge secret; and even Hole did not have such knowledge.

In the majority opinion it is stated that " the entire transaction, as the record discloses, was supervised and consummated by her personal counsel and representatives, who must be presumed to have taken proper precaution to protect her interests." Any such presumption

that might be indulged in in the ordinary case can not apply here in the face of the evidence, which shows that Hole paid one Benedict, a nephew of Mrs. Hopkins, $125,000 for his services and influence in negotiating this option; that Hole also enlisted similar services and influence of William Hill, Mrs. Hopkins' manager, for which he paid Hill $35,000 and agreed to give him *one-fourth of the stock* which he (Hole) was to receive in the corporation to be organized; and that Mrs. Hopkins' attorney was " anxious " for Mrs. Hopkins' nephew to " make something." The option was not signed by Mrs. Hopkins, but was signed on her behalf by her counsel as attorney in fact. This option called for a price for the land of $33⅓ per acre, whereas the first option which Mrs. Hopkins had granted to Hole called for a price of $20 per acre for the land. It was understood by Mrs. Hopkins' attorney that the difference of $13⅓ per acre to be paid under such option should go to Hole, and that Mrs. Hopkins would only get $20 per acre for the land if the option were exercised. The evidence definitely shows that Mrs. Hopkins did not have intimate management of the property. The inferences to be drawn from this situation are that Mrs. Hopkins did not know of the price of $33⅓ per acre provided in the option, or that Hole was to receive the difference of $13⅓ per acre. The evidence does not disclose that Hill, Benedict, or Mrs. Hopkins' attorney knew of the discovery of oil sands on the property; but, even if they did, it is apparent that they would not have advised Mrs. Hopkins of the fact, for the reason that they were all personally interested, for one reason or another, in seeing the option granted to Hole. In so far as Mrs. Hopkins and Hole dealt for an option covering the land in question, the actual cash value of the option is not reflected for the reason that neither of them had knowledge of the existence of the numerous indications that this was oil land. Hole's principal experience had been in agricultural land and he was not an experienced oil man like Green and Whittier. In so far as Hole dealt in reference to this option with Green and Whittier or with the petitioner, the actual cash value is not reflected, for the reason that Hole did not have this knowledge of the existence of these indications of oil upon the land. Furthermore, Mrs. Hopkins and her representatives, on the one part, and Hole, on the other part, were not dealing as strangers or at arm's length. They were dealing at close range. If a sale is made under peculiar circumstances, and we have such here, it does not establish market value. See *Weed* v. *Lyons Petroleum Co.*, 294 Fed. 725, at page 734. The facts and circumstances and the infirmities pointed out above take the sale out of the category of a " fair sale " for the purpose of establishing actual cash value of the option, and also fail to satisfy the requirements pointed out in *Andrew B. C. Dohrmann*, *supra*, to the effect, among

others, that both parties to a trade must have reasonable knowledge of all the material circumstances.

It should be pointed out, however, that the petitioner was not a party to this deal with Mrs. Hopkins. Petitioner was not in existence than. Furthermore, no question is raised here as to the legality of the transaction. Mrs. Hopkins and those in privity with her are the only parties who might successfully raise questions as to the validity of that transaction. See *Taplin* v. *Commissioner*, 41 Fed. (2d) 454. They are not before us. The only question before us is that of the actual cash value of the option.

Hole was willing to pay a great deal more than $25,000 to procure the option, and he did in fact pay, besides the $25,000 furnished by Green, $160,000 in cash and transferred one-fourth of the stock which he received in the petitioner corporation, or a total of more than $185,000. The very fact that Hole actually did pay out a total of at least $185,000 to procure this option leads to the inescapable inference that the option had a value far in excess of $25,000. The actual *cost* of procuring the option is at least $185,000. In addition to this $185,000, Hole was required to deliver to Hill one-fourth of Hole's share of petitioner's corporate stock. Hole thus paid over $185,000 to procure the option, notwithstanding that he did not know that Van Slyke had discovered outcroppings of oil on the land, which were confirmed by others. It must be inferred from the evidence that, if Hole had known what Van Slyke and others knew in this respect, he would have put a higher value on the option. He testified that if he had known this, he would not have sold the land at $33⅓ per acre.

There is evidence to show that on September 2, 1910, the Associated Oil Company purchased, for $66⅔ per acre, 24,000 acres of prospective oil land located a little closer to the producing Lost Hills oil property than the Hopkins land. That transaction is more convincing upon the question of value before us than the evidence of the sale of the option with all of the infirmities inherent therein, as pointed out above.

In the majority opinion it is stated in effect that this sale of property to the Associated Oil Company is not entitled to much weight, for the reason that the record does not show its state of development. The map, petitioner's Exhibit 6, demonstrates that none of that property was developed as oil land previous to 1911 and that previous to 1911 there were no indications of oil or gas upon that land. Furthermore, it is established by other evidence that that land had not been proven to be oil land and that it was merely prospective undeveloped oil land, as was the property in question here. Harry R. Johnson, of whom more will be said later, testified that the closest

*proven* oil territory to the property purchased by the Associated Oil Company at that time was a part of the Lost Hills Field. He testified that the land acquired by the Associated Oil Company was not in as good prospective oil territory as the property involved here and was less valuable for oil. The map shows that the Hopkins land was located closer to producing oil lands than was the Associated Oil Company's property. The Hopkins land was near Gould Hill, Temblor Valley, and the McKittrick Field, which were at that time better established oil fields than the producing portion of the Lost Hills area, which was the closest proven oil territory to the land of the Associated Oil Company. The Hopkins land was about three miles north of Gould Hills, about six miles north of the Temblor Ranch Field and the McKittrick Field, and was not more than eight miles south of the producing area of Lost Hills.

There is also convincing expert testimony in the instant proceeding which establishes an actual cash value for the option greatly in excess of $25,000. The expert witnesses were Burton E. Green, Harry R. Johnson, and W. W. Orcutt.

Green went into the oil business in 1895 and, at various times, operated in the northeastern part of the Los Angeles Field, in the Colinga Field, and in the McKittrick Field, and was instrumental in the organization of several oil companies including the Green-Whittier Oil Company, the Associated Oil Company, the Amalgamated Oil Company, the West Coast Oil Company, and the Inca Oil Company. He was familiar with the developments that had taken place in the Midway Oil Field and the Lost Hills section, and he had developed the McKittrick Field. At the hearing Green testified that the outcroppings of oil on the Hopkins land were quite similar to those in the Lost Hills section. He testified that all the outcroppings which he had ever approved resulted in the development of oil fields, including the Colinga Field, McKittrick Field, the Kern River Field, the La Habra Field, and the Wolfskill property. He testified that the fair market, or actual cash, value at January 25, 1911, of the Hopkins land was at least $100 per acre, that he would have paid $100 per acre for it, and that he was in financial condition to do so. He further testified that if other companies had known the facts which he and Whittier knew about the property he and Whittier would not have been able to obtain the land for $100 per acre. He stated that the Lost Hills territory had been under development for about a year before the petitioner obtained the option and that land in that section had sold for as high as $100 per acre. These sales had taken place after oil croppings had been exposed and a shallow hole had been drilled. The land sold was located some distance from this shallow hole and in a portion of the Lost Hills area which was not as favorable for oil.

Johnson is a consulting petroleum geologist. He graduated from Leland Stanford University about 1905 or 1906. Thereafter, he reentered the United States Geological Survey, with which he had been associated even before he entered college, and in 1908 did extensive work in examining the geologic structure of the general region in which the property in question is located. and in compiling Government bulletins in connection therewith. In 1911 he personally became informed of the conditions of the Hopkins land as found in 1910 by Van Slyke. He visited the property with Van Slyke shortly before the hearing in this proceeding and verified all material conditions found by Van Slyke in 1910, which were substantially the same as they were shortly before the hearing. These material conditions of 1910 were likewise verified shortly before the hearing by W. W. Orcutt, of whom more will appear later. After his resignation from the United States Geological Survey in 1909, Johnson went into private business in Los Angeles. Such business consisted of examining and valuing oil areas and advising clients as to prices to be paid for prospective oil lands. At the hearing he testified that Van Slyke's findings of oil indications in 1910 should have caused a practical oil man like Van Slyke to reach the natural and almost inevitable conclusion that the Hopkins land was valuable oil land, that a person having the knowledge of the Hopkins land which Green and Whittier had in 1910 would have been justified in paying approximately $2,900,000 for it, and that he would have advised clients to purchase the property under those conditions at that price. He testified that that was its fair market value as of January 25, 1911, prior to any actual discovery of oil on the property, beyond that made by Van Slyke.

Orcutt graduated from Leland Stanford University in 1895, with the degree of A. B., after pursuing the study of geology as a major subject. He was thereafter employed by the Union Oil Company to organize their geological department. He was later chief engineer and manager of the geological and land department of that company and still later became vice president. That company at first had a capitalization of about $50,000,000. Later its capitalization was increased to $100,000,000. He leased and purchased oil lands for the Union Oil Company and was so employed in 1910 and 1911. He testified that if on January 25, 1911, he had known the facts which Green knew about the Hopkins land on that date, and he had been advising his employer, the Union Oil Company, or any other party, what to pay for the property, he would have recommended that they pay $2,700,000. This, he testified, was the fair market value of the property as of that date. His opinion was based in part upon the similarity of the outcroppings and structure of this

area with that of the Lost Hills section, the Buena Vista Field and several other oil fields throughout southern and central California.

The opinions of all of these experts as to the value of the Hopkins land were well fortified by reasons and were borne out by the fact that, promptly after petitioner obtained the option in question, producing oil wells were brought in on the land. The logs of the first two wells which were sunk by the petitioner on the Hopkins land were received in evidence for the limited purpose of corroborating the findings of Van Slyke made in 1910, which were confirmed by Green in the same year and by Johnson and Orcutt shortly before the hearing in the proceeding, and for no other purpose. No attempt was made to prove the value of the option in question by showing how many wells were sunk, how much oil was produced by each, and what profits were made by the petitioner. Such evidence would be inadmissible. Green did testify, without objection, that the development of the oil lands covered by the option in question was successful.

These expert witnesses were intelligent, candid, and well qualified to express opinions as to the value of the land which was the subject of the option, and *their testimony shows that it had a value greatly in excess of the price at which it could be purchased under the option.* None of them was impeached. Their expert opinions were not met or rebutted by similar proof to the contrary. Their expert opinions stand undisputed in the record. Their expert testimony is in fact corroborated by other competent, credible, persuasive evidence, much of which is inherent in the situation. This expert opinion evidence, together with this other evidence in line with it, should be used together with all of the competent evidence upon the subject in arriving at the actual cash value of the option. There is nothing in the record to outweigh it all. No mere presumption or prima facie showing can stand as against it all. See *Montana Ry. Co.* v. *Warren*, 137 U. S. 348, and more particularly the discussion at pages 352 to 354. That case involved the value of mineral lands and sustains the view that expert opinion evidence as to value is peculiarly helpful and looked upon with favor in a situation such as we have here. See also *Troxel Mfg. Co.*, 1 B. T. A. 653; and *Bowman Hotel Corporation*, 24 B. T. A. 1193, more particularly at page 1210.

Once the value of the land is established, the value of the option can be readily determined. The actual cash value of an option is the difference between the value of the land and the price at which it can be obtained under the option. *Karl von Platen*, 10 B. T. A. 250; *Realty Sales Co.*, 10 B. T. A. 1217; *Robert Brunton Studios, Inc.*, 15 B. T. A. 727; and *United Studios, Inc.*, 15 B. T. A. 737.

To the effect that an option is tangible property, see section 325 of the Revenue Act of 1921, *Nansemond Brick Corporation*, 8 B. T. A. 1117, and *Reserve Natural Gas. Co., of Louisiana*, 15 B. T. A. 951. It should therefore be included in petitioner's invested capital for the years in question at its actual cash value. (Sec. 326 (a) (2), Revenue Act of 1921.)

The majority opinion also relies upon our decision in *Belridge Oil Co.*, 11 B. T. A. 127, which was a proceeding between the same parties as are here concerned, and wherein it was held that the value of this same option for invested capital purposes for the years 1917 and 1920 was $25,000. While that decision is not *res judicata* in the instant proceeding, findings of fact in a proceeding before the Board under the Revenue Act of 1924 are prima facie correct in subsequent proceedings before the Board between the same parties, when properly introduced, as they were in the instant proceeding. *Union Metal Mfg. Co.*, 4 B. T. A. 287; *Goodell-Pratt Co.*, 6 B. T. A. 1235; *American Steel Co.*, 7 B. T. A. 641; *American Seating Co.*, 14 B. T. A. 328; affd., *Commissioner* v. *American Seating Co.*, 50 Fed. (2d) 681. However, findings of fact made by the Board in a prior proceeding, being mere prima facie evidence, may be rebutted in a subsequent proceeding between the same parties before the Board. See *Charles M. Monroe Stationery Co.*, 15 B. T. A. 1227, wherein we stated that the decision in *Charles M. Monroe Stationery Co.*, 3 B. T. A. 69, was consistent with the evidence there presented, but that in the proceeding under consideration there was present a different state of evidence.

The evidence introduced by petitioner in this proceeding overcomes the presumption in favor of the correctness of the value found in *Belridge Oil Co.*, 11 B. T. A. 127. In that proceeding there was lacking evidence which appears in the instant proceeding, namely, evidence of the infirmities of the sale of the option, the actual cost of the option of over $185,000, the acquisition by the Associated Oil Company in September, 1910, for $66⅔ per acre, of property in Kern County, California, which was comparable to the land in question, expert testimony upon the question of value, and other evidence which did not appear in the prior proceeding, as herein set forth. The testimony of four witnesses, Hole, Clute, Gillan, and Van Slyke, was offered in the prior proceeding upon the question of the value of the land as oil land. The testimony of two of them, Hole and Clute, was stricken. Gillan expressed his opinion as a layman, and not as an expert. The opinion of Van Slyke, whose testimony shows that he was not qualified to testify as an expert on value, was received without objection. Thus, in the prior proceed-

ing there was no expert opinion evidence of the value of either the land as oil land, or of the option.

In the opinion in the former proceeding in regard to the transaction by which Hole acquired the option, it is stated:

* * * The fact that one Van Slyke sometime in 1910 discovered an outcrop of oil sand on the property is not shown to be controlling. This discovery preceded the giving of the option to Hole and for aught that appears the existence of this outcrop may have been known to Hole when he acquired the option. The evidence does not indicate that at the time of the assignment petitioner had any greater knowledge of the oil-bearing properties of the land than had Hole when he took the option. * * *

The evidence in the instant proceeding discloses that Hole did not know of the discovery of an outcrop of oil sand on this property. He testified that if he had known what Green and Whittier knew in this respect he would not have parted with his option for the consideration which he received for it. The evidence further shows that at the time of the assignment of the option to the petitioner, the stockholders (and more particularly the moving spirits, Green and Whittier) other than Hole did have greater knowledge of the oil-bearing properties of the land than had Hole when he took the option.

We are not called upon here to reconsider or review the correctness of the Board's decision in *Belridge Oil Co.*, 11 B. T. A. 127, and no criticism of it is being offered. But the proof is radically different in the instant proceeding.

The Board's decision in the former proceeding has been invoked, in the majority opinion, as a precedent for the instant proceeding. As such it has no value, for the reason that it is clearly distinguishable upon the facts, as fully pointed out herein. As a precedent, it is not binding. To hold otherwise would lead to the same result as to hold that the former decision is *res judicata*. The majority opinion recognizes that it is not. Since this is true, we are in the same position as we would be in if there had been no former proceeding, with the exception of the prima facie showing based on the Board's former finding of the value of the option; and that, as pointed out herein, has been overcome by the proof which appears here and did not appear there.

The only evidence offered by the respondent in the instant proceeding consists of the findings of the Board fixing the value of the option in this former proceeding. In doing this he merely made a prima facie showing, which was rebuttable. His proof accomplished nothing else. A careful examination of the entire record discloses that there is nothing to support the position of the respondent in which he limits the actual cash value of this option for invested capital purposes to $25,000, except rebuttable presumptions or their

equivalent. The first presumption is that his determination in this respect is correct. The second presumption or its equivalent arises from the prima facie showing that was made when he offered the findings of the Board in *Belridge Oil Co.*, 11 B. T. A. 127, as evidence of the value of this option as therein fixed at $25,000 for similar purposes for previous years. A presumption, such as we have here, is not proof, as was stated in *Heiner* v. *Donnan, supra*. As stated there, it is merely a substitute for proof and is open to challenge and disproof. A prima facie showing, such as we have here, is no stronger. Both of them have been rebutted, disproved, and overcome. In this situation the burden of proof shifted to the respondent. He has done nothing to discharge his burden in this respect.

Notwithstanding any presumption in favor of the respondent or prima facie showing made for him, the evidence adduced at the hearing establishes a value of the land substantially in excess of the price at which it could be purchased under the option and an actual cash value of the option substantially in excess of $25,000.

Any statements or comments of fact made herein by way of supplement to the findings of fact of the majority of the Board will be found to be supported by evidence which is not disputed.

Obviously, it is not the province of a dissenting opinion to fix another value in excess of $25,000. That is within the province of the majority of the Board.