LANGWELL REAL ESTATE CORPORATION, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 23758. Promulgated March 20, 1934.

*Sydney W. Stern*, Esq., and *David Greenberg*, Esq., for the petitioner.

*Bruce A. Low*, Esq., and *Arthur Carnduff*, Esq., for the respondent.

In its opinion the court stated in part:

EVANS, C.J.: We find it impossible to escape the conclusion that upon the tenant's release of its interest in said $50,000, respondent was enriched by that amount. Regulations 62 Treasury Department, Article 50. It was relieved of its obligation to pay this amount to the tenant at the expiration of the lease. At the same time and as a part of the same transaction, respondent released the tenant from its lease. Whether respondent suffered a loss by reason of the termination of the lease presents another issue, which is not covered by the findings of the Board of Tax Appeals. *If respondent could have readily negotiated another lease with a responsible party, as favorable as the lease which was cancelled, it suffered no loss. On the other hand, if it could not have negotiated such a lease, then it suffered a loss.* The amount of such loss, if any, was the legitimate subject of proof. The actual execution of a new lease was not necessary to determine this issue. The rental value of such property could be shown by oral testimony.

\* \* \* \* \* \* \*

We think the Board was in error in assuming that a loss was sustained which offset the $50,000 gain. In the absence of proof sufficient to support a contrary finding by the Board of Tax Appeals, the finding of the Commissioner should have been sustained (*Avery* v. *Commissioner*, 22 F. (2d) 6). The record before us does not warrant our making a finding on this issue nor is it necessary for us so to do. 26 U. S. C. A. Sec. 1219; *K. Coal Co. & D. Co.* v. *Commissioner*, 29 F. (2d) 559.

Under all of the circumstances we think it would be promotive of justice in this instance to remand the case for further hearing. *The taxpayer should be permitted the opportunity of offering evidence to show that it suffered a loss and also the extent of its loss.* If the proof be sufficient to sustain a finding of the amount of such loss, that sum should be deducted from the said $50,000. If no such loss be established, then the sum of $50,000 should be included as part of the taxpayer's income.

The order of the Board of Tax Appeals is reversed with directions to proceed in accordance with the views expressed herein. [Emphasis supplied.]

Thereafter, in accordance with the opinion and mandate of the court, further hearings were had before the Board at New York and Chicago. Based on evidence received at those hearings, we make additional findings of fact.

### FINDINGS OF FACT.

The property which was the subject of the lease is located at 123–129 West 44th Street, New York City, and consists of a lot 100 by 100.5 feet and a thirteen-story hotel building known as the Langwell Hotel. It was known for many years as the Hotel Girard. The petitioner acquired the property early in the year 1923, at a cost of $950,000. In June 1923 the building was about 30 years old. The hotel had 300 rooms and 100 baths. It had 66 suites of two and three rooms each, and the others were single rooms. This property is located about 350 feet from Broadway.

In 1920 the buildings on 44th Street between the property in question and Broadway consisted of restaurants, one theatre, and some

small stores. On the other side of the property in question the buildings included the Belasco Theatre, which is adjacent to the property in question, and some five-story buildings. In 1922 the Paramount Building was built on the west side of Broadway, at 43d and 44th Streets, about 700 feet from the property in question. It was generally known in 1923 that the elevated railway from 53d Street to 59th Street was to be removed. It was actually removed in 1924 or 1925. In 1922 or 1923 several contracts were let for hotel buildings on 48th and 49th Streets. Some loft building projects were finished on 46th Street in 1924. There was considerable building along Fifth Avenue and Broadway in 1922 and 1923. Hopes for higher land values were prevalent in that neighborhood, and there was a speculative improvement in value of the property in question. Improvements in buildings between 42d and 50th Streets and between Fifth Avenue and Broadway from 1920 to 1923 included a number of new hotels and apartment houses, increasing the value of all property in that neighborhood, including the property in question.

About 1920 the lower part of the Langwell Hotel was closed for violation of the prohibition laws and at various times it had been closed as an immoral house. It has not been closed since 1920.

The lease in question, which went into effect on April 1, 1920, provided for a net rental of $80,000 per year. The lease contained the following provision:

It is the intention of the parties hereto and is understood and agreed by the Tenant that the Landlord shall not be called upon to make any payments of any kind, nature or description whatsoever for the upkeep, maintenance, repair or replacement of said premises, or for any taxes, assessments or charges against the same or for the compliance of any orders of any department, Federal, State or Municipal having jurisdiction over said premises, but that the rental of Eighty Thousand ($80,000.00) Dollars per year reserved herein shall be absolutely net to the Landlord during the full term of the lease, excepting interest on mortgages which may be granted or executed by the Landlord or the owner or holder of title to said premises.

Under the agreement, dated June 20, 1923, between the petitioner and the Keystone Hotel Corporation, canceling the lease, the Keystone Hotel Corporation was permitted to continue in possession of the hotel until September 30, 1923. The agreement also provided for the purchase by the petitioner from the Keystone Hotel Corporation of all of the furniture and fixtures belonging to the corporation and then contained in the hotel, for the sum of $65,000.

The petitioner had to cancel the lease in question because the Keystone Hotel Corporation was an undesirable tenant in that it was not paying its rent. The petitioner was glad to get rid of the tenant. The tenant was losing money in the operation of the hotel. The

lease was canceled while the petitioner was negotiating for the sale of the property.

In July 1923 the petitioner entered into an agreement to sell the property in question to the 123–129 West 44th Street Corporation and the deal was consummated in October 1923. This sale included all of the furniture and fixtures which petitioner had purchased from the Keystone Hotel Corporation for $65,000. The total consideration which petitioner received was $1,050,000, made up as follows: The purchaser took the property subject to a first mortgage of $542,500, and subject to a second mortgage of $300,000; the purchaser executed to the petitioner a purchase money third mortgage in the amount of $157,500; and the purchaser paid petitioner $50,000 in cash. This $50,000 was in payment for the furniture and fixtures. The duration of the third mortgage was 10 years. It provided for quarter-yearly payments of $2,500 until the first day of October 1933, on which date the remainder was to become due and payable. This mortgage provided for interest at 6 percent per annum. At the time of this sale the petitioner negotiated with the purchaser to dispose of this third mortgage to the purchaser for $100,000. The purchaser, however, could not raise the cash to purchase the third mortgage at that time, but in June 1926 the purchaser did purchase the third mortgage at a reduction of $42,500. The remainder of the face of the mortgage, $115,000, was paid to the petitioner in cash.

### OPINION.

McMAHON: The court remanded the instant cause to the Board for the purpose of permitting the petitioner to show whether or not it suffered a loss upon the termination of the lease and, if so, the amount thereof. The court stated in its opinion that if the petitioner could not have negotiated another lease with a responsible party as favorable as the lease which was canceled, the petitioner suffered a loss which might properly be used to offset the gain of $50,000; that the amount of such loss, if any, was the legitimate subject of proof; and that the rental value of such property could be shown by oral testimony.

After a full consideration of all the admissible evidence adduced, we are not convinced that the petitioner could not, upon the cancellation of the lease in question, have readily negotiated a lease with a responsible party as favorable as the one which was canceled.

The petitioner, in an attempt to prove that it could not have obtained a lease as favorable as the canceled lease, introduced the testimony of Alfred N. Gitterman and that of Frank Sullivan, two New York real estate appraisers. Gitterman is also a real estate

broker. Gitterman testified that in his opinion on June 20, 1923, the net rental value per annum of the property in question was $64,000. He arrived at this figure by taking 6 percent of what in his opinion was·the value of the land·and 8 percent of what in his opinion was the value of the building. He testified that he estimated the duplication value of the building at $425,000 and the value of the land at $500,000. He testified that leases in that part of the city were being made upon the basis of these percentages, and that he negotiated other leases in that·neighborhood upon that basis. These other buildings which the witness leased were, however,·different in type from the property in question here. He testified that the petitioner, by canceling the lease providing for a net rental of $80,000 per annum, thus lost $16,000 per annum in rent, and, since in 1923 the lease in question had approximately 18 years to run, the total loss to the petitioner was in excess of the sum of $50,000. Sullivan testified that in his opinion the net rental value of the property in question herein on June 20, 1923, to a responsible tenant, and upon the terms of a lease similar to the one in question here, was $59,000. He arrived at his opinion as to the net rental value by using the same formula used by Gitterman. He, however, appraised the land at a value of $450,000, and the building at a value of $400,000. Sullivan testified that the petitioner, upon the surrender of the lease in question on June 20, 1923, suffered a loss in excess of $50,000. Sullivan testified that he does not know anything about the unsavory reputation of the hotel in question in 1920. He testified that there was no change in the value of property in that section after 1920. He testified that there was speculation going on in that neighborhood, but that it " never meant anything." He testified further that " to a certain extent " the selling price of property did not represent its value.

The opinions of these witnesses as to the rental value of the property in question are not binding upon the Board. *Uncasville Mfg. Co.* v. *Commissioner*, 55 Fed. (2d) 893, and *Belridge Oil Co.*, 26 B.T.A. 810. We are not willing to accept the rental valuations to which they testified. Assuming, but not deciding, that their formula for calculating the rental value of property, that is, by taking 6 percent of the value of the land and 8 percent of the value of buildings, is correct, their results are incorrect since, in our opinion, the values of the property which they used in their calculations were incorrect. The evidence adduced at the original hearing in this proceeding, and the findings of fact reported in our first opinion, *Langwell Real Estate Corp.*, 17 B.T.A. 196, show that on January 27, 1923, E. Lewis Jacobs, as seller, and Abraham J. Cooper and Samuel J. Cooper, as purchasers, entered into a contract for the sale of the same real

estate as is covered by the lease. This contract of sale was at a price of $950,000. The property was to be sold subject to the lease to the Keystone Hotel Corporation. The above contract was assigned by Abraham J. Cooper and Samuel J. Cooper to the petitioner during 1923. The petitioner carried out the deal with E. Lewis Jacobs.

The evidence shows that in July 1923, shortly after the lease on the property was canceled, the petitioner entered into an agreement to sell the property in question, including furniture and fixtures which had recently cost the petitioner $65,000, for $1,050,000. Fifty thousand dollars of such purchase price was paid for the furniture and fixtures, leaving the selling price of the land and building $1,000,000. It is thus apparent that the valuation of $925,000 placed upon the property by Alfred N. Gitterman and the valuation of $850,000 placed upon the property by Frank Sullivan are erroneous. The best evidence as to the value of property is a fair sale of such property when not too remote from the date of valuation. *Andrews* v. *Commissioner*, 38 Fed. (2d) 55; affirming *Estate of Effie Andrews*, 13 B.T.A. 651; *Hazleton* v. *LeDuc*, 10 App. D.C. 379; and *Ruppert* v. *McArdle*, 42 App. D.C. 392. So far as we are advised both these sales which occurred in 1923 were fair sales, and the sale of the property by the petitioner for $1,000,000 in 1923 was near enough in point of time to the date of the cancellation of the lease, June 20, 1923, to establish the value of the property at the date of cancellation.

Part of the consideration which was received by the petitioner upon the sale of its property in 1923 was a purchase money third mortgage in the amount of $157,500. Abraham J. Cooper, treasurer and one of the two stockholders of the petitioner in 1923, testified that at the time petitioner acquired the third mortgage its value was not over $100,000, that he offered it to the purchaser for $100,000 at that time, and that the petitioner disposed of it to the purchaser in 1926 for $115,000. The purpose of this testimony was apparently to show that the value of the property at the time of this sale as established by the sale was less than $1,000,000. There is nothing to show that this third mortgage would not be paid in full, with interest at 6 percent as it matured, or that the parties considered the security or the margin thereof inadequate. Too, it was not shown that it was not the usual procedure in New York City at that time to pay for real property by executing such mortgages. So far as we know Gitterman and Sullivan, in fixing their valuations of the property in question, had in mind the amount for which the property would sell for a similar kind of consideration. In our opinion the amount of $1,000,000 should be taken as the selling price of the property in question.

We have determined that the value of the property was $1,000,000 at the date of the cancellation of the lease, but even though it were assumed that the method employed by Gitterman and Sullivan in arriving at the rental value of the property is correct, that is, by taking 6 percent of the value of the land and 8 percent of the value of the building, the evidence is insufficient to allow us to apply that formula to determine the rental value of the property, since there is no evidence upon which we can allocate the $1,000,000 selling price as between the land and the building.

Furthermore, in determining the rental value or loss of rental value of property, the value of such property is not alone to be considered. There are other factors to be considered, and in reaching our conclusion in the instant proceeding we not only have taken into consideration the fact that the property had a value of $1,000,000 in 1923, at the time of the cancellation of the lease, but have considered all the other facts and circumstances, as appears herein.

The fact that in 1920, when, as the proof shows, the property in question was less valuable than it was in 1923, a lease was executed providing for a net rental of $80,000 a year indicates that rental value of property can not be computed accurately by applying a formula to the value of the property. The fact that such a lease was obtained in 1920 indicates that there was some additional value in the property for rental purposes not reflected by the value and attributable to other factors. This additional value may have been due to the location of the property, the attractiveness of its interior, or other factors, but as stated, we are not advised in this respect.

Abraham J. Cooper testified that after the cancellation of the lease he endeavored to make a new lease on the property on behalf of the petitioner. He testified that he placed the property in the hands of several leading real estate brokers in New York and told them that petitioner would accept as low as $60,000 rental for the premises, but no offers were received. There is no evidence to show that either the brokers, the petitioner, or Cooper made bona fide offers of rental at the figure of $60,000 or any other figure to any responsible prospective lessee, or that anything beyond this was actually done by any of them to procure such a lessee at that or any other figure. There is no evidence of a bona fide effort to rent the property to a responsible lessee at the same rental of $80,000 annually. The petitioner contends that the fact that the Keystone Hotel Corporation was operating the property at a loss tends to show that the rental of $80,000 provided in the lease in question was excessive. However, this does not necessarily follow. The loss may have been due to poor management. We have no proof upon that subject.

Gitterman testified that the shortage of housing of the caliber of the Langwell Hotel in New York was acute in 1920, 1921, and a part of 1922, but that in the latter part of 1922 and in 1923 the shortage was less. The petitioner relies upon this to establish that the rental value of the property was less in 1923 than it was in 1920, when the lease in question was executed. This is a conclusion of the witness which is not binding. No evidence was adduced upon which the Board might make its own comparison of conditions in 1920 and 1923. There is no evidence to show the extent of the shortage in 1923 and therefore there is no showing that the shortage was so reduced as to prevent the execution of a lease as advantageous to the petitioner in 1923 as the lease which was canceled.

The petitioner points to the fact that the property was about 30 years old in 1923 and that there had been a marked improvement in the neighborhood from 1920 to 1923, due to the building of new hotels and apartment houses. Petitioner contends that this rendered the property obsolete, resulting in lower rental value in 1923. However, there is no proof to sustain the holding that the property became obsolete. On the other hand, the evidence shows that, due to these improvements between 1920 and 1923, the value of the property in question was enhanced.

Gitterman testified that the demand was for single rooms with adequate bath facilities after 1922. The petitioner contends that, due to the fact that the Langwell Hotel had 66 two and three-room suites, it would not have a large rental value in 1923. However, the evidence shows that the Langwell Hotel had 300 rooms and 100 baths. We have no proof to show exactly how many single rooms there were with bath facilities, but, assuming that there were an equal number of two and three-room suites, the hotel would then have only slightly more than one half of its total number of rooms in suites. There would remain a goodly proportion of single rooms, nearly half; and we can not say from the evidence that this demand for single rooms in 1923 would detract from the rental value of the property. Furthermore, there is no showing as to how many rooms had no bath connections.

The petitioner also contends that the fact that the Keystone Hotel Corporation was willing to surrender a $50,000 deposit to secure a release of the lease is proof of the fact that the property was not then worth the rental that was being paid. The evidence indicates that the reason the Keystone Hotel Corporation was desirous of giving up the lease was that it was operating at a loss and, as heretofore stated, we do not know what caused such loss. It may have been poor management. So far as the record shows there may have been other reasons.

The evidence shows that the property in question increased in value between 1920 and 1923, due in part to the fact that several large buildings had been built in the neighborhood during that period. This is shown in part by the testimony of the witness Gitterman. The two sales of the property in 1923 referred to above show that the value of the property increased in that year by an amount of $50,000. Furthermore, the evidence shows that the property in question was much more desirable in 1923 than it was in 1920. In 1920 the hotel had an unsavory reputation and was closed for violations of the law. However, the evidence shows that the hotel has not been closed for such reasons since 1920. The evidence shows that the petitioner canceled this lease because the Keystone Hotel Corporation was an undesirable tenant in that it was not paying its rent. The evidence also shows that the petitioner was glad to get rid of this tenant. Thus, much of the evidence tends to show that upon the cancellation of the old lease, the petitioner probably could have obtained a lease just as advantageous as the lease which was canceled.

The respondent contends that the cancellation of the lease was necessary before the petitioner could effect the sale of the property in the year 1923. The evidence does strongly suggest that this may have been true. The Keystone Hotel Corporation was an undesirable tenant in that it was not paying rent and it is reasonable to suppose that the purchaser of the property would not care to have the property encumbered by such a lease. The evidence shows that, at the time of the agreement on June 20, 1923, to cancel the lease, negotiations were under way for the sale of the property. Under the terms of the cancellation agreement the tenant was to vacate the premises by September 30, 1923. The agreement to sell the property was entered into in July 1923. The evidence adduced at the original hearing in this proceeding, and our findings of fact in *Langwell Real Estate Corp.*, 17 B.T.A. 196, disclose that this deal was consummated on October 1, 1923. It seems significant to us that the date upon which the tenant under the lease was to vacate the premises coincided with the date upon which the purchaser of the property was to take possession. We may say in passing that, if it was necessary for the petitioner to obtain the cancellation of the lease before it could effect a sale of the property, it would seem that, far from sustaining a loss upon the cancellation, the petitioner actually was benefited thereby.

We hold that the petitioner has not shown it did sustain a loss upon the cancellation of the lease and that, hence, in accordance with the opinion of the United States Circuit Court of Appeals for the Seventh Circuit, the amount of $50,000 should be included in the petitioner's income for the year 1923, undiminished by any amount as a loss upon the cancellation of the lease.

Pursuant to and in accordance with the opinion and mandate of the court, as we understand them, we have taken additional evidence upon the question of whether or not the petitioner could or could not have readily obtained, upon the cancellation of the lease in question, another lease as favorable as the lease which was canceled. In view of our holding that the petitioner has not shown that it could not have readily obtained just as favorable a lease, there is no occasion for further consideration of the question of whether there has been proved a proper basis for the deduction of a loss upon the cancellation of the lease in question. Cf. *Frank F. Nicola*, 1. B.T.A. 487; *M. F. Tarpey*, 4 B.T.A. 1056; and *Forrester Box Co.*, 25 B.T.A. 128.

At the taking of evidence preliminary to the final hearing had pursuant to the direction of the court, there was offered and admitted, over the objection of counsel for the petitioner, a copy of the Board's findings of fact and opinion in *E. Louis Jacobs*, 20 B.T.A. 529. Thereafter, the respondent offered the transcript of the evidence in that proceeding. However, the respondent later withdrew the offer of the transcript. Upon further consideration we are of the opinion that the findings of fact and opinion are not properly admissible in this proceeding and so hold, since that proceeding did not involve the same parties or issues here involved and the petitioner had no opportunity to cross-examine the witnesses upon whose evidence the findings are based, or offer other evidence, or be otherwise heard upon the issues covered by the findings and opinion.

At the same preliminary taking of evidence there was received in evidence, over the objection of counsel for the respondent, the parol evidence of the witness Gitterman as to the amount at which the property in question was assessed in 1923 for purposes of taxation in the city of New York. Upon further consideration it is our opinion that such evidence is not properly admissible, and we so hold. It was not shown that Gitterman was an officer or employee of the petitioner, nor was it shown that he was connected in any way with the taxing authorities of the city of New York. He did not have before him the original records of the city relating to the assessed valuation. No officer or employee of the city was produced to testify as to the assessed valuation from original records or otherwise, and we are without any evidence as to how such valuation was made, or what the basis of it was. We do not know from the evidence that the assessed valuation was intended to represent the fair market value of the property. The party or parties who made the appraisal of the property for the city were not presented as witnesses and the respondent was therefore not accorded the right of cross-examination with regard to the assessed valuation.

In our consideration of this proceeding, we have not considered either the testimony of Gitterman, just above referred to, or the findings of fact and opinion in *E. Louis Jacobs, supra,* nor have we found any facts herein based on them. The defects in the evidence offered were not cured at the final hearing.

Reviewed by the Board.

*Decision will be entered under Rule 50.*

SMITH, STERNHAGEN, VAN FOSSAN, and SEAWELL concur in the result.